**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steaven Martin BASINGER, Defendant–Appellant.**

No. 94–30159.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1995.

Decided July 24, 1995.

George Paul Trejo, Jr., Contreras–Trejo & Trejo, Yakima, WA, for defendant-appellant.

Donald E. Kresse, Jr., Asst. U.S. Atty., Yakima, WA, for plaintiff-appellee.

Before: POOLE, BOOCHEVER, and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

## OVERVIEW

In January 1994, a jury convicted Steaven M. Basinger of establishing a drug manufacturing facility in violation of 21 U.S.C. § 856(a)(1), and manufacturing methamphetamine in violation of 21 U.S.C. § 841(a)(1). He was sentenced to 151 months on each count, to be served concurrently. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS

Steaven M. Basinger lived in his mobile home on property located at 61 Dorsett Drive, in Yakima, Washington, from some time in November 1992 until a few days before Christmas 1992. Jay Woods, who owned the property, lived in Nebraska and gave Basinger permission to spend the winter there. A derelict motor home and an L-shaped shed were already on the property. One section of the shed stored tools, furniture, and other odds and ends. The other section was secured, and it primarily stored chemicals and equipment left over from Woods' former pesticide business and chemistry experiments.

On November 29, 1992, Woods' son-in-law, Bruce McDonald, went to the property to meet Basinger and to search for some of Woods' crucibles in the shed. He noted that Basinger seemed "paranoid" about McDonald entering the shed and seemed to want to keep McDonald out. McDonald entered anyway and noticed that things had been moved around.

McDonald returned to the property on December 28, 1992. He discovered that the shed was secured differently and more tightly than it had been before. He noticed that Basinger's mobile home was not on the premises, but a U–Haul trailer rented to

Basinger was there. Upon entering the secured section of the shed, McDonald discovered what appeared to be a clandestine drug laboratory. He contacted the authorities, who obtained a warrant to search the property.

Officers discovered evidence that the laboratory in the shed had been used to produce methamphetamine. Basinger was arrested and charged with knowingly maintaining a place for the purpose of manufacturing, distributing, or using methamphetamine (Count I), and with knowingly or intentionally manufacturing methamphetamine (Count II). He was convicted on both counts on January 21, 1994.

The district court determined that 453 to 680 grams of methamphetamine had been produced at the lab. This resulted in a sentencing range of 151 to 188 months under the Sentencing Guidelines. The court sentenced Basinger to 151 months imprisonment on each count, to be served concurrently. Basinger timely appeals both his conviction and his sentence.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

The evidence is sufficient to support Basinger's conviction if, reviewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 162, 130 L.Ed.2d 100 (1994). Circumstantial evidence may be sufficient to sustain the conviction. *Lennick*, 18 F.3d at 820.

#### A. Count I: Establishment of Manufacturing Operations

As to Count I, the government had to prove that Basinger (1) knowingly (2) opened or maintained a place (3) for the purpose of manufacturing, distributing, or using methamphetamine. 21 U.S.C. § 856(a)(1). We conclude that there is sufficient evidence to support Basinger's conviction on this count.

### 1. Knowledge

■ There is an abundance of evidence from which the jury could infer Basinger's knowledge of the methamphetamine laboratory, including: Basinger's residence on the property and access to the shed; evidence that Basinger had, in fact, been in the secured portion of the shed; McDonald's testimony that Basinger apparently did not want McDonald to enter the shed; testimony that Basinger was the only person seen or heard on the property; the fact that the shed was brightly lit at night when Basinger was on the property; the additional security installed at the shed (*e.g.*, new locks, covered window, secured plywood) some time between McDonald's November and December visits; and the obvious indicia of a methamphetamine laboratory in the shed. *See United States v. Onick,* 889 F.2d 1425, 1431 (5th Cir.1989).

### 2. Opening or Maintaining a Place

Basinger focuses his argument on the second element of section 856(a)(1), urging that he did not "open or maintain a place" for the purpose of manufacturing, distributing, or using methamphetamine. Basinger relies solely on cases addressing evidentiary sufficiency in the context of convictions for *possession* of contraband. He argues that he cannot be convicted of "opening or maintaining a place" for drug activity absent a showing that he exercised "dominion and control" over the premises.

This circuit has never addressed the applicability of the "dominion and control" inquiry to convictions under section 856. Cases from other circuits suggest that proof of a defendant's "dominion and control" over a place may be *sufficient* to show that he "maintains" that place, *see United States v. Howell,* 31 F.3d 740, 741 (8th Cir.1994) (per curiam), but that proof of "dominion and control" is not *necessary* to establish "maintenance" under section 856(a)(1), *see United States v.*

*Clavis,* 956 F.2d 1079, 1091, *modified on other grounds,* 977 F.2d 538 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993). In *Clavis,* the Eleventh Circuit stated that "[a]cts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity" are relevant to the defendant's "maintenance" of a place. 956 F.2d at 1091.

■ We need not decide in this case whether a showing of less than dominion and control would be sufficient to demonstrate a defendant's "maintenance" of the property. The evidence, viewed in the light most favorable to the government, supports the inference that Basinger exercised "dominion and control" over the property. Basinger sought and received permission to live on the property during the winter. He was the only resident on the property and the only day-to-day caretaker and supervisor of the site. In return for permission to stay on the site, Basinger agreed to repair the water system. There was evidence that Basinger and, occasionally, his female guest were the only people seen or heard on the property. There was evidence that Basinger entered the secured section of the shed where the laboratory was found. *Cf. United States v. Walker,* 993 F.2d 196, 200 (9th Cir.) (defendant's "dominion and control" over drugs found in apartment was established where defendant possessed keys to apartment and bedrooms, and defendant's clothes and shoes, a receipt with his name, and a large sum of cash were found near the drugs), *cert. denied,* —— U.S. ——, 114 S.Ct. 276, 126 L.Ed.2d 227 (1993); *United States v. Disla,* 805 F.2d 1340, 1350 (9th Cir.1986) (constructive possession of contraband may be shown by defendant's " 'exclusive control or dominion over property on which contraband [is] found' ") (citation omitted).[1]

---

**1.** The cases Basinger cites, in which the evidence was insufficient to establish dominion and control, all involve affirmative evidence that another occupant of the premises, and *not* the defendant, in fact exercised dominion and control over the premises and the contraband found there. *See, e.g., United States v. Vasquez–Chan,* 978 F.2d 546,

549–51 (9th Cir.1992); *United States v. Penagos,* 823 F.2d 346, 350–51 (9th Cir.1987); *United States v. Behanna,* 814 F.2d 1318, 1319–20 (9th Cir.1987). In this case, by contrast, the evidence suggests that Basinger was the only person who could have exercised dominion and control over the premises and the lab.

**3. For the Purpose of Manufacturing, Distributing, or Using Methamphetamine**

■ The jury could also infer that Basinger had the purpose to "manufacture, distribute, or use" methamphetamine at the site. There was extensive and obvious methamphetamine manufacturing paraphernalia in the secured section of the shed. Evidence was introduced that Basinger on a previous occasion had been found in possession of methamphetamine and red phosphorous, which is an essential chemical in the production of methamphetamine by the "red phosphorous method" (probably used in this lab, according to expert testimony). There was evidence that Basinger was the only person present at the site, and thus a jury could infer that he was the "supervisor, manager, or entrepreneur" of the laboratory. *See United States v. Banks,* 987 F.2d 463, 466–67 (7th Cir.1993); *Onick,* 889 F.2d at 1431.

**B. Count II: Manufacture of Methamphetamine**

■ As to Count II, the government had to prove that Basinger (1) knowingly or intentionally (2) manufactured methamphetamine. 21 U.S.C. § 841(a)(1). We hold that the evidence was sufficient to allow the jury to conclude that Basinger manufactured the methamphetamine found in the shed. We discuss the two elements of this offense in reverse order.

■ First, there is sufficient evidence from which the jury could find that methamphetamine was manufactured at the site. Law enforcement personnel found traces of methamphetamine in various flasks and containers, empty containers of ephedrine (a precursor chemical), an acetone wash solution containing detectable amounts of methamphetamine, and other paraphernalia used in the manufacture of methamphetamine (*e.g.,* separation flasks, litmus paper, a heating plate, and filters). *See United States v. Calabrese,* 825 F.2d 1342, 1345, 1348 (9th Cir.1987) (finding sufficient evidence to support conviction for manufacturing methamphetamine based largely on equipment containing trace amounts of methamphetamine seized on the defendant's premises).

■ Second, there is sufficient evidence from which the jury could infer that Basinger had the knowledge or intention to manufacture the methamphetamine. Neighbors testified that Basinger was the only person they had seen or heard on the property from late November to late December 1992. They saw and heard him at night when the shed was brightly lit. Detective Sergeant Baldwin testified that methamphetamine is commonly manufactured at night when there are fewer people around who might detect the distinctive odor. Electric bills confirmed an abnormally high energy use at the property during the two months Basinger was on the property. Although Basinger was not on the property when the lab was discovered, the U-Haul trailer rented in his name was on the property and there is evidence that he returned to the property after the lab had been searched and dismantled. There was evidence that Basinger had been in the secured section of the shed where the lab was found. McDonald testified that Basinger apparently did not want others entering the shed. Basinger previously had been in possession of red phosphorous.

This court has previously found that various factors present in this case are helpful to establish sufficient proof under section 841(a)(1). *See, e.g., Lennick,* 18 F.3d at 820 (electric bill indicative of marijuana growing at defendant's house); *United States v. Peacock,* 761 F.2d 1313, 1315–16 (9th Cir.) (defendant's connection to a rented truck seen near site helped connect defendant to methamphetamine lab), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985).

## II. EXPERT TESTIMONY

■ Over Basinger's objection, the district court allowed a government expert witness, Roger Ely, to estimate how much methamphetamine could be produced at the site using the red phosphorus method of production. Basinger argues that the government's failure to inform him before trial that Ely would testify along those lines violated Fed.R.Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10

L.Ed.2d 215 (1963).[2] Rule 16(a)(1)(E) requires disclosure of "a written summary of [expert] testimony the government intends to use ... during its case in chief at trial. This summary must describe the witnesses' opinions, the bases and reasons therefor, and the witnesses' qualifications." Basinger urges that the proper remedy for the alleged violations is reversal of his convictions.

■■■■■ This court will only reverse a conviction because of a discovery violation if the district court abused its discretion and that error resulted in prejudice to the defendant's substantial rights. *United States v. Baker*, 10 F.3d 1374, 1398 (9th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). Even assuming an abuse of discretion, we hold that reversal is not required because Basinger's substantial rights were not violated. Basinger was aware before trial that Ely would "testify about his testing of the controlled substances" found at the site, and that "Mr. Ely will offer testimony on the red phosphorous method of methamphetamine production." Basinger was fully informed about the relevant evidence seized from the shed that formed the basis for Ely's testimony. The district court also offered Basinger additional time to review reports and prepare for cross-examination. *See Baker*, 10 F.3d at 1398.

## III. EVIDENCE SEIZED DURING A PRIOR ARREST

Basinger sought to exclude testimony regarding certain items that had been seized during a 1991 traffic stop and arrest in California. Over his objection, Officer Hablitzel testified that he had stopped Basinger for an equipment violation regarding the car he was driving. Hablitzel noticed an illegal switchblade knife on Basinger's belt, and on that basis arrested Basinger. Hablitzel conducted a search of Basinger's car pursuant to the arrest and discovered (1) approximately 1¼ gram of methamphetamine, (2) $10,440 cash, and (3) a 90–pound drum of red phosphorous in the trunk.

Basinger argues that testimony regarding the seized items should have been suppressed because Hablitzel's search was illegal. He alternatively argues that the testimony was inadmissible under Fed.R.Evid. 404(b) and 403 as "prior bad acts" evidence.

■■■■■ This court reviews the denial of Basinger's motion to suppress on Fourth Amendment grounds *de novo* and reviews the trial court's factual findings for clear error. *United States v. Becker*, 23 F.3d 1537, 1539 (9th Cir.1994). The court reviews the lower court's rulings under Rules 404(b) and 403 for an abuse of discretion. *United States v. Houser*, 929 F.2d 1369, 1373 (9th Cir.1990).

### A. Fourth Amendment

Basinger essentially asks us to determine the constitutionality of the 1991 arrest and subsequent search. Such an assessment is unnecessary, however, because the Fourth Amendment does not bar admission of this evidence, even assuming the search was illegal. *See United States v. Lopez–Martinez*, 725 F.2d 471, 476 (9th Cir.), *cert. denied*, 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984).

■■■■■ Here, as in *Lopez–Martinez*, "there is no suggestion ... of any bad faith or collusion" by the officers involved in the 1991 and the instant cases; "the [officer] in [1991] did not have the [instant] proceedings in [his] 'zone of primary interest.'" 725 F.2d at 476 (quoting *United States v. Janis*, 428 U.S. 433, 458, 96 S.Ct. 3021, 3034, 49 L.Ed.2d 1046 (1976)). Thus, even if the 1991 search was illegal, exclusion of the evidence in the present case would be unwarranted because exclusion would have a minimal deterrent effect. *See id.*

### B. Federal Rule of Evidence 404(b)

■■■■■ Hablitzel's testimony is more appropriately challenged under Fed.R.Evid. 404(b). Under that rule, evidence of prior acts may not be admitted to prove a defendant's character, but it may be admitted for other purposes, such as to show knowledge

---

**2.** Contrary to Basinger's assertion, *Brady* only requires production of *exculpatory* evidence that is material to a defendant's guilt or punishment.

373 U.S. at 87, 83 S.Ct. at 1196. Ely's testimony is not *Brady* material. We therefore do not address further Basinger's *Brady* argument.

and intent, if it satisfies the following requirements:

(1) it must prove a material element of the offense for which the defendant is now charged; (2) in certain cases, the prior conduct must be similar to the charged conduct; (3) proof of the prior conduct must be based upon sufficient evidence; and (4) the prior conduct must not be too remote in time.

*United States v. Arambula–Ruiz*, 987 F.2d 599, 602 (9th Cir.1993). In addition, the probative value of the evidence must outweigh its prejudicial effect under Rule 403. *Id.*

■■■■ The seized evidence satisfies Rules 404(b) and 403.[3] First, knowledge and intent are essential elements of both charged offenses in this case. *See* 21 U.S.C. §§ 841, 856. The drum of red phosphorous found in Basinger's car on a previous occasion tends to make Basinger's knowledge that methamphetamine was manufactured (allegedly using the red phosphorous method) in the shed more probable than it would be without the evidence. The presence of red phosphorous, especially in conjunction with the presence of methamphetamine and cash, also increases the probability that Basinger intended to manufacture methamphetamine and intended to use the site for the "manufacture, distribution, or use" of methamphetamine. *See Arambula–Ruiz*, 987 F.2d at 603.

Second, Basinger's previous possession of red phosphorous, especially in conjunction with his possession of methamphetamine, bears a sufficient factual similarity to the instant charges (manufacturing and maintaining a place to manufacture methamphetamine using the red phosphorous method) to satisfy the similarity requirement. *See id.*

Third, testimony by the searching and arresting officer is sufficient evidence that the prior act occurred. *Cf. United States v. Hinton*, 31 F.3d 817, 823 (9th Cir.1994) ("low threshold" for this requirement is satisfied by uncorroborated testimony by victim that

prior acts had occurred), *cert. denied,* —— U.S. ——, 115 S.Ct. 773, 130 L.Ed.2d 669 (1995). Fourth, evidence of acts that occurred in 1991 is not too remote. *See Houser*, 929 F.2d at 1373 (evidence of five-year-old prior conviction not too remote).

The district court did not make an explicit finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. However, that failure does not render admission of the evidence improper in this case, because the lower court implicitly made the necessary finding by admitting the evidence after expressly noting his awareness of Rule 403's balancing requirement. *See United States v. Ramirez–Jiminez*, 967 F.2d 1321, 1326 (9th Cir.1992) (necessary finding was implicitly made where lower court admitted evidence after receiving pretrial motion noting that court had to weigh probative value and prejudice).

Admission of the evidence under Rule 403 was not an abuse of discretion. As described above, the evidence is probative of Basinger's knowing manufacture of methamphetamine using the red phosphorous method, and of his knowing or intentional maintenance of a place to manufacture methamphetamine using that method. The evidence is "prejudicial only to the extent that it tends to prove the fact justifying its admission, namely that [Basinger] had knowledge." *Ramirez–Jiminez*, 967 F.2d at 1327. That does not constitute "unfair" prejudice. Moreover, the district court gave a limiting instruction, which reduces the danger of unfair prejudice. *See Arambula–Ruiz*, 987 F.2d at 604.

## IV. SENTENCING

Basinger challenges his sentence on several grounds. First, he argues that the district court based its sentence on an erroneous calculation of the amount of methamphetamine Basinger manufactured. Second, he

---

**3.** If the seized evidence included nothing more than personal-use amounts of methamphetamine, our result might be different. *See United States v. Vizcarra–Martinez*, 57 F.3d 1506, 1513–14, 1515 (9th Cir.1995) (evidence of a defendant's prior possession of personal-use amount of methamphetamine should have been excluded under

Rule 404(b) because it did not tend to prove that the defendant possessed hydriodic acid with the knowledge that it would be used to manufacture methamphetamine). In this case, however, the methamphetamine was seized in conjunction with a 90–pound drum of red phosphorous and a large sum of cash.

argues that the district court should have sentenced him under U.S.S.G. § 2D1.11, rather than section 2D1.1. Third, he argues that his sentence should have been based on "L–Methamphetamine" rather than on "D–Methamphetamine."

 The district court's interpretation and application of the Sentencing Guidelines are reviewed *de novo*. *United States v. Buenrostro–Torres*, 24 F.3d 1173, 1174 (9th Cir.1994) (per curiam). The court's underlying factual findings, including the capability of a drug operation, are reviewed for clear error. *United States v. Williams*, 989 F.2d 1061, 1073 (9th Cir.1993).

A. Quantity of Methamphetamine Produced

The district court calculated Basinger's sentence based on its determination that 453 to 680 grams of methamphetamine were produced at the site. Ely testified about two possible ways to calculate the amount of methamphetamine produced. The first was based on the amount and contents of the acetone wash, and yielded an estimate of 10–15 kilograms. Ely testified that he believed this to be a conservative estimate. Both the government and the presentence report recommended sentencing based on this figure. Ely's second calculation was based on the two empty one-pound containers of ephedrine found at the site, and yielded an estimate of 453 to 680 grams. The court, at Basinger's request, accepted the second method of calculation.

Where, as here, "there is no drug seizure or the amount seized does not reflect the scale of the offense," the sentencing court is allowed to "approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 application note 12; *United States v. Bertrand*, 926 F.2d 838, 846 (9th Cir.1991). This court specifically has allowed a sentencing court to calculate "potential" methamphetamine based on seized precursor chemicals, such as

ephedrine. *See Bertrand*, 926 F.2d at 846–47; *see also United States v. Roberts*, 5 F.3d 365, 372 (9th Cir.1993). We have also approved a sentencing court's reliance on expert testimony that estimates production capability, even when the expert must assume the availability of precursor chemicals that were not seized or were found in short supply. *See Williams*, 989 F.2d at 1073.

 Although this court has permitted sentencing courts to approximate the capability of a drug lab even when certain essential chemicals are not present, Basinger argues that the above-cited cases do not apply here. In this case, he argues, the government seized only empty ephedrine containers and no actual precursor chemicals. We agree that this situation presents a more difficult question, but we nevertheless hold that the sentencing court's estimate in this case was not clearly erroneous.

Dale Mann, the Supervising Forensic Scientist at the Washington State Patrol Crime Laboratory, testified that the chemical by-products found in the shed are characteristic of the red phosphorous method of producing methamphetamine. That method requires ephedrine as the starter chemical. Ely testified that it is common to find empty ephedrine containers because all the ephedrine is ultimately converted into methamphetamine. Therefore, the calculation used by the district court assumed the presence of two pounds of ephedrine (based on the two empty one-pound ephedrine containers found in the lab), and determined the amount of methamphetamine that would be produced using that ephedrine.[4] This court has approved a similar calculation by a district court. *See Williams*, 989 F.2d at 1073 & n. 5 (affirming district court's estimate that was based on the capacity of empty glassware; the presence of some, but not all, precursor chemicals; and possibly also on the assumption that a partly empty container of one of the precursors had been full); *cf. United States v. Acevedo*, 28 F.3d 686, 689–90 (7th Cir.1994)

---

4. There was testimony that another essential precursor chemical, red phosphorous, was easy to obtain, and the district court apparently agreed that the remaining requisite precursors could be obtained easily. *See Bertrand*, 926 F.2d at 846–47 (district court's finding concerning production capability of lab was not clearly erroneous where "the district court apparently concluded that, although no hydriodic acid [a precursor chemical] was present, it easily could be obtained").

(allowing sentencing court to calculate the amount of cocaine distributed based on capacity of empty baggies with cocaine residue in them).[5] We are not "firmly convinced that a mistake has been made" by the district court. *See Williams*, 989 F.2d at 1073. Accordingly, we hold that the court did not commit clear error by sentencing Basinger based on its finding that 453 to 680 grams of methamphetamine were produced at the lab.

### B. Application of U.S.S.G. § 2D1.1

█ Basinger argues that because the sentencing court could not calculate the amount of methamphetamine the lab could produce with any certainty, the court should have applied U.S.S.G. § 2D1.11 rather than section 2D1.1. Section 2D1.11 applies to convictions for possession of a chemical listed in 21 U.S.C. § 841(d), while section 2D1.1 covers manufacture of a controlled substance under 21 U.S.C. § 841(a). Basinger was convicted of manufacturing methamphetamine, rather than of possessing a listed precursor chemical. Where, as we have held here, the district court was able to estimate drug quantity, "there is no reason to depart from 2D1.1." *See United States v. Myers*, 993 F.2d 713, 715–16 (9th Cir.1993).[6]

### C. Sentencing Based on D–Methamphetamine

█ The Sentencing Guidelines treat the manufacture of D–Methamphetamine more harshly than they treat the manufacture of L–Methamphetamine. *See* U.S.S.G.

§ 2D1.1 drug equivalency table. Ely testified at the sentencing hearing that the evidence taken from the shed indicated a methamphetamine production process that could only result in the production of D–Methamphetamine. Basinger argues that despite this evidence, the rule of lenity requires sentencing based on L–Methamphetamine. The rule of lenity does not apply unless a statute is grievously ambiguous. *United States v. Crowell*, 9 F.3d 1452, 1455 (9th Cir.1993) (citing *Chapman v. United States*, 500 U.S. 453, 463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991)), *cert. denied*, ── U.S. ──, 115 S.Ct. 120, 130 L.Ed.2d 66 (1994). Section 2D1.1 is not. *Crowell*, 9 F.3d at 1455. Therefore, the district court properly calculated Basinger's sentence based on its estimate of 453 to 680 grams of D–Methamphetamine.

### CONCLUSION

For the foregoing reasons, Basinger's conviction and sentence are AFFIRMED.

---

**5.** We also note that the district court minimized the potential for overestimating drug quantity by adopting the expert's most conservative figure. Ely testified that he believed that his calculation based on two pounds of ephedrine was a conservative estimate of the methamphetamine that actually had been produced in the lab. Other evidence, such as the amount and color of the acetone wash found in the lab, indicated to him that significantly more methamphetamine had in fact been produced. *See Acevedo*, 28 F.3d at 689–90 (because estimating the amount of drugs is "inherently an inexact science but is one in which the district courts must be engaged," district court should proceed with caution and take "pains to err on the side of underestimation").

**6.** Because this is not a case in which "it is simply not possible for the [district] court to make a reliable estimate of the amount of drugs involved," Basinger's reliance on *United States v. Perrone*, 936 F.2d 1403, 1419 (1991) (holding that sentence should be based on amount of precursor chemicals possessed by the defendant, rather than on the amount of cocaine that could have been manufactured with the precursors), *clarified*, 949 F.2d 36 (2d Cir.1993), is misplaced. Unlike this case, there was no evidence in *Perrone*, other than the defendant's possession of certain precursor chemicals, that the defendant was involved in the manufacture of drugs. *Id.* at 1415.